

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. WR-78,113-01

### EX PARTE HUMBERTO GARZA, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. CR-3175-04-G(1) IN THE 370TH DISTRICT COURT
### HIDALGO COUNTY

HERVEY, J., delivered the opinion of the Court in which RICHARDSON, NEWELL, KEEL, WALKER, MCCLURE, JJ., joined. KELLER, P.J., filed a dissenting opinion in which SLAUGHTER, J., joined. YEARY, J., dissented.

## O P I N I O N

We have before us an application for a writ of habeas corpus filed pursuant to Article 11.071 of the Texas Code of Criminal Procedure. In March 2005, a jury found Applicant, Humberto Garza, guilty of murdering six men in the course of committing or attempting to commit the offense of robbery. *See* TEX. PENAL CODE § 19.03(a)(2). The jury answered the special issues submitted pursuant to Article 37.071 of the Texas Code

of Criminal Procedure, and the trial court, accordingly, sentenced Applicant to death. TEX. CODE CRIM. PROC. art. 37.071. This Court affirmed Applicant's capital murder conviction and death sentence on direct appeal. *Garza v. State*, No. AP–75,217, 2008 WL 1914673 (Tex. Crim. App. Apr. 30, 2008) (not designated for publication).

Applicant filed his initial habeas corpus application in the trial court in 2007 raising twenty-eight claims for relief, including twelve allegations of ineffective assistance of counsel. Over five years after Applicant filed his initial application, and after prompting by this Court, the trial court entered an order designating issues. In that order, the trial judge directed lead trial counsel, Ralph R. Martinez, and co-counsel, Librado "Keno" Vasquez, to file affidavits responding to Applicant's ineffective-assistance-of-counsel allegations. The trial court held an evidentiary hearing in August 2014, during which Martinez and Vasquez both testified. On February 12, 2015, the trial court signed a 635-page order adopting findings of fact and conclusions of law recommending that Applicant be denied relief on all grounds.

In his third allegation, Applicant asserted that his trial counsel's failure to conduct a constitutionally adequate investigation of mitigating evidence deprived him of his Sixth Amendment right to effective assistance of counsel pursuant to *Wiggins v. Smith*, 539 U.S. 510 (2003). We remanded this claim to the trial court for further development. *Ex parte Garza*, No. WR-78,113-01, 2016 WL 1161263 (Tex. Crim. App. Mar. 23, 2016) (not designated for publication). The trial court signed an order adopting supplemental

findings of fact and conclusions of law, recommended denying relief, and returned the case to this Court. After remand, we filed and set the case and directed the parties to submit briefs on Applicant's third allegation. *Ex parte Garza*, No. WR-78,113-01, 2017 WL 4021978 (Tex. Crim. App. Sep. 13, 2017) (not designated for publication).

Based on our independent review of the record, we conclude that Applicant is entitled to a new punishment hearing because his trial counsel's mitigation investigation fell below an objective standard of reasonableness, and had counsel not been deficient, there is a reasonable probability that at least one juror would have struck a different balance and would have answered the mitigation issue differently, voting to spare Applicant's life. *Ex parte Gonzales*, 204 S.W.3d 391, 394 (Tex. Crim. App. 2006) ("We have adapted the Supreme Court's prejudice test to require a showing that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently.").

## I.     Applicant's Argument: Trial Counsel Were Ineffective Due to Their Failure to Conduct an Adequate Penalty-Phase Investigation

Applicant contends that he was denied his Sixth Amendment right to effective assistance of counsel because his trial counsel failed to investigate, discover, present, and explain mitigating evidence at the punishment phase of his trial. Under *Wiggins*, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional

judgments support the limitations on investigation." *Wiggins*, 539 U.S. at 522 (quoting

*Strickland v. Washington*, 466 U.S. 668, 690–91 (1984)).

Applicant argues that his first attorney, Charles Banker, who represented him for a

year and eight months, did not conduct any mitigation investigation.[1] He maintains that

his second lead counsel, Martinez, essentially "delegated his duty to investigate" to

Applicant's mother, "who assisted counsel by calling individuals, taking counsel to their

homes to talk with them, or arranging for these individuals to meet counsel at a

designated location." Applicant notes that his mother set up group meetings between his

lead attorney and members of her family at a hotel. Applicant asserts that his attorneys did

not try to find any witnesses on their own and did not ask Applicant or the other witnesses

about sensitive and potentially embarrassing information, such as his mother's pregnancy

with him, substance abuse, or physical or sexual abuse within the family. Consequently,

counsel learned nothing about these matters, and the minimal amount of relevant

information counsel did obtain was superficial.[2] In particular, Applicant contends that his

trial attorneys performed deficiently by failing to:

- Conduct meaningful interviews of Applicant's family and other individuals who had critical information about his childhood, instead interviewing family members in a group setting;

---

[1] Applicant's mother initially retained Banker to represent Applicant. When Banker withdrew in October 2004 for financial reasons, she hired Martinez. The trial court appointed Vasquez in November 2004 to assist Martinez. Jury selection began on February 14, 2005.

[2] Counsel learned that Applicant had witnessed a murder as a child because Applicant's mother volunteered that information.

- Hire a mitigation specialist to investigate or request court funding to obtain an investigator;

- Retain a mental health expert to screen for possible mental disorders and/or impairments and conduct a detailed life-history investigation;

- Gather basic social history documents, such as educational, employment, medical, and juvenile records, which would reveal his repeated exposure in childhood to trauma and provide evidence of mental health disorders; and

- Review the three available psychological evaluations conducted when Applicant was 15 and 16 years old, which contained information that could have led to more mitigating evidence, such as evidence that Applicant: expressed concern over losing his temper and "being pushed into sex"; attempted "to cut his wrist as part of a suicide gesture"; and had a "history of emotional problems consistent with chronic depression, Depressive Neurosis, and a possible Post-Traumatic Disorder, untreated[.]"

Applicant argues that counsel did not discover that Applicant was repeatedly exposed to trauma and suffers from mental health disorders, nor did he learn about Applicant's extended family's dysfunction because of his inadequate mitigation investigation. He asserts that this dysfunction was due to widespread substance abuse, violent conduct, and family members' involvement in drug trafficking. Further, due to counsel's limited investigation, Applicant asserts, counsel did not obtain family members' statements divulging that Applicant's mother: tried to abort Applicant; drank about one 24-ounce can of beer a day throughout her pregnancy with Applicant; was not affectionate with Applicant; and frequently left Applicant alone during his adolescence.

Applicant's mother told counsel that, at around age 10, Applicant saw a man

fatally shoot their family friend in the head. Applicant argues that his counsel should have investigated further and that, if he had, he would have discovered that Applicant was traumatized by this event and never received counseling. Applicant contends that his counsel did not know that Applicant's father beat his mother when she was pregnant and sexually abused her younger sister and his own younger sister. Counsel also did not discover that Applicant was sexually abused when he was 5 or 6 years old by his 13-year-old aunt who had been molested by Applicant's father (her older brother).

Relying on the 2003 American Bar Association Guidelines for defense counsel in death penalty cases, Applicant contends that his defense team should have included at least one mitigation specialist and at least one member qualified to screen individuals for mental or psychological disorders. *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases is only persuasive authority when determining whether counsel's conduct fell below an objective standard of reasonableness at the time of the representation). Applicant further notes that his lead attorney promised the jury certain mitigating evidence about Applicant's life history in his opening statement at punishment and then failed to deliver. For example, counsel told the jury that, when Applicant was growing up, his father "paid very little, if any, attention to him," left his mother when Applicant was very young, and "was a violent man" who "was probably a member of the Texas Syndicate gang." Counsel told the jury that Applicant "nevertheless loved his father. He

yearned for his father. He had a psychological or emotional deprivation because of that, and it caused anger and stress." Similarly, counsel further informed the jury that, although Applicant's mother was present, she neglected Applicant in favor of other relationships, and to make up for it, she spoiled Applicant "in the extreme."

Applicant maintains that counsel produced little or no evidence to support the promises he made in opening statements. The defense case at punishment, Applicant notes, consisted of eight witnesses. Five witnesses had known Applicant for only a short time and testified about his good behavior and religious devotion in jail while awaiting trial. Applicant complains that counsel called only three witnesses about his life history, and their testimony did not back up some of counsel's opening statements. Applicant's maternal aunt testified that she was close to her sister (Applicant's mother) and Applicant, and that Applicant's father was never around. She also testified that she was an active member of her church and had been ministering to Applicant for many years. Applicant's mother testified that his father was not around when he was growing up because his father was in prison and that she has always had a good relationship with Applicant. She also testified that he treated Applicant "[g]ood." Blanca Alicia Cortez, a family friend, tried to testify that, as a young boy, Applicant had witnessed the brutal murder of her late husband. However, the trial court barred much of her testimony in response to the State's hearsay objections.

Applicant points out that the State's attorney seized on his counsel's failure to

produce the promised mitigating evidence by arguing to the jury:

> There has been no evidence of everything that he talked about during his opening; no traumatic event in his childhood, no major change in his life. No father figure? People grow up with hard lives and make something of their lives, not become captains of the [Tri-City Bombers].

He compares the mitigation investigation in his case to that in *Ex Parte Gonzales*, in which this Court granted relief due to trial counsel's failure to develop mitigating evidence that Gonzales had suffered extensive childhood sexual and physical abuse and had post-traumatic stress disorder (PTSD). *Gonzales*, 204 S.W.3d at 399.

Applicant asserts that his trial counsel's failure to introduce mitigating evidence "cannot be deemed strategic" because counsel had not conducted an adequate investigation. He asks this Court to grant him a new punishment phase trial, asserting that, "[i]t is clear that [Applicant's] available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of his moral culpability."

## II.  Standard of Review

On post-conviction review of habeas corpus applications, the convicting court is the "original factfinder" and this Court is the "ultimate factfinder." *Ex parte Thuesen*, 546 S.W.3d 145, 157 (Tex. Crim. App. 2017) (citing *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008)). We typically defer to the convicting court's findings of fact that are reasonably supported by the record, and we afford that same deference to a habeas judge's ruling on "mixed questions of law and fact" that turn on credibility and demeanor. *Ex parte Weinstein*, 421 S.W.3d 656, 664 (Tex. Crim. App. 2014). But "[w]hen our

independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record, we may exercise our authority to make contrary or alternative findings and conclusions." *Id.* (quoting *Reed*, 271 S.W.3d at 727).

To prevail on an ineffective-assistance-of-counsel claim, an applicant must show that his counsel's performance was deficient and that the deficiency prejudiced him. *Strickland*, 466 U.S. at 687. He can establish deficiency by showing that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, considering the facts of the case viewed from counsel's perspective at the time of the representation. *Id*. at 687–88, 690; *Wiggins*, 539 U.S. at 523. In undertaking this analysis, we must make every effort to "eliminate the distorting effects of hindsight." *Wiggins*, 539 U.S. at 523 (citing *Strickland*, 466 U.S. at 689). When dealing with inadequate-investigation claims, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 521–22 (citing *Strickland*, 466 U.S. at 690–91).

To establish prejudice, an applicant must show that there is "a reasonable probability that, absent the errors, the jury would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Gonzales*, 204 S.W.3d at 393–94 (citing *Strickland*, 466 U.S. at 695). That is, considering the entirety of the aggravating and mitigating circumstances in the trial and habeas records, is there a

reasonable probability that the jury would have answered the mitigation issue differently than it did at trial. *Id*. at 394. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. This inquiry "'necessarily requires courts to speculate as to the effect of the new evidence' on the trial evidence . . . ." *Id.* at 1887 (punctuation omitted). Also, even if the evidence of future dangerousness is overwhelming, as the court found here, that is not dispositive of the analysis, although it makes it much more difficult for an applicant to prevail. *See Rompilla v. Beard*, 545 U.S. 374, 290, 393 (2005). And even if the available mitigating evidence is "double-edged"—meaning that some jurors might think the evidence increases the defendant's moral blameworthiness while others might find that it reduces it—that is also not dispositive of the analysis, and the evidence must be considered in the analysis. *See id.*; *Wiggins*, 539 U.S. at 534; *Williams v. Taylor*, 529 U.S. 362, 398 (2000).

## III. Trial Evidence

### A. Guilt Phase

On January 5, 2003, police officers were dispatched to the scene of a "pseudocop robbery"[3] in Edinburg, Texas. When the officers arrived at the property, which had two small houses on it, they found the bodies of six men who had been shot. Some of the bodies were bound with extension cords. Several of the victims were Texas Chicano Brotherhood gang members, including one victim who was a "captain" in the

---

[3]A "pseudocop robbery" is a robbery committed by a person or persons who are dressed like and claim to be law-enforcement officers.

organization.

Following his arrest, Applicant waived his rights and gave a statement to a detective. Applicant said that he was a "captain" in the Tri-City Bombers and that another gang member named Choche had reported to him that a friend's girlfriend, while attending a party at the property in question, observed "what she described as several hundred pounds of marijuana stacked in one of the houses . . . ."[4] Applicant was upset, he said, because Choche called a high-ranking member of the Tri-City Bombers in Houston before he told Applicant. And Applicant explained that Choche should have come to him first instead of "jump[ing] rank" since it was "his call" as "the captain and leader, locally, of the Tri-City Bombers."

Applicant said he and other gang members quickly put together a plan to steal the marijuana from the Edinburg property, which the Texas Chicano Brotherhood controlled. The detective explained that the Tri-City Bombers had a "green light" against the Texas Chicano Brotherhood, which meant that the Tri-City Bombers' members could engage with, fight, or kill the Texas Chicano Brotherhood's members without prior approval.

Applicant told the detective that he called—or directed others to call—several people including "Kito," "Perro," "Little Sal," "Ram," "Bones," "Kreeper," and Ricardo and told them that "they were going to do a job." Applicant arranged for the gang members to meet at the house of an associate named Juanon and for Kreeper to bring the

---

[4]The detective explained at trial that a captain in the Tri-City Bombers is "rather high ranking" because the gang has a "semi-military structure[.]"

Tri-City Bombers' guns. Applicant explained that he (Applicant) "made the decisions" about how to execute the robbery. Applicant decided that they would use two different vehicles, including a stolen red truck, and that they would use the weapons that Kreeper brought.

Applicant told the detective that some of the gang members wore ski masks and some of them wore gloves. Applicant and another driver dropped the men off with their guns at a small store behind the Edinburg property. Applicant and Juanon stayed in the stolen truck and drove around, "ready to pick the guys up when it was over." They kept in touch with the others via phone. When the men reported that they had completed the job, Applicant picked up some of the men and "took off." Applicant said that the men he picked up reported that the marijuana was not there but that they "killed everybody." The Tri-City Bombers' members all met at Juanon's house and then "went their separate ways." The investigating officers used the information Applicant supplied to locate others involved in the crime.

An FBI agent testified that Applicant waived his rights and gave him a statement. Applicant told the agent that the murders were not supposed to happen and that the men were authorized only to take the drugs. Applicant told the agent that the shooting "was a result of a bunch of trigger-happy guys." Applicant said that the Tri-City Bombers gang was now basically dismantled because the police had arrested a captain (Applicant), two sergeants, and a lieutenant. He also said that he wanted to show the officers some

locations in the Donna, Texas area that were related to the murders. Applicant mentioned to the agent that Tri-City Bombers' members Bones, "Snoop," and Ricardo killed three people in Edinburg on another occasion. Applicant told the agent that "[i]t was supposed to be a drug rip-off, but all three of the victims were shot and killed." Applicant also told the agent that Juanon had shot and killed a man involved in a custody dispute with the mother of a fellow Tri-City Bomber named Jeffrey Juarez.

### B.       Punishment Phase

At the punishment phase of trial, the State re-offered the evidence from the guilt phase and presented evidence of Applicant's substantial criminal history. The evidence showed that Applicant committed the offense of unauthorized use of a motor vehicle at age fifteen and was placed on probation. He later violated his probation conditions by possessing a weapon. He was then committed to the Texas Youth Commission (TYC) and later released on parole. In July 1991, shortly before his seventeenth birthday, Applicant attempted to stab and kill someone. He was certified to stand trial as an adult for that offense. After being released on bond, he participated in a home burglary and stole valuable items including guns and a Corvette. Applicant pled guilty to attempted murder and burglary and was sentenced to eighteen years' confinement in the Texas Department of Criminal Justice (TDCJ).

Trial counsel presented eight witnesses at the punishment phase. A Sheriff's Department officer testified that the Department had not had "any problem" with

Applicant in the facility where he had been detained for this offense and that Applicant had participated in Bible study. Three other witnesses testified that Applicant had actively participated in prison ministry programs. A treatment-program counselor testified that, upon his release on parole, Applicant attended three months of an alcohol-abuse treatment program and attended church on Sundays.

Blanca testified that, at age ten, Applicant saw the "blood gushing out of [her husband's] head" after he was fatally shot. The defense tried to introduce more evidence from this witness about her husband's murder, but the trial court granted the State's objections to this testimony.

Applicant's aunt testified that his father had not been present much in Applicant's home. The aunt said that she loved Applicant and had tried to help him and minister to him throughout his life. She remained close to him through his high school years and had visited him in prison. However, she did not know that he was in a gang.

Applicant's mother testified that she tried to help Applicant and obtain counseling for him when he got in trouble in high school. She testified that Applicant was incarcerated from when he was 16 years old until he was 27 years old. She said that she visited him regularly when he was in prison and that she had always had a good relationship with him. When Applicant was released on parole, she said that she purchased a truck for him and that he made half the payments. She recalled that, when Applicant was on parole, he got a job with Speedy's Oil Field Service through some

people he knew. She further testified that Applicant's father was often in prison and did not live with the family when Applicant was growing up: "He was hardly around for my son." However, she said that Applicant's father treated Applicant "[g]ood." She said that Applicant's father died in prison and that, about a year later, Applicant was arrested for the instant offense. She said that Applicant was not in a gang.

## IV.     Habeas Proceedings

### A.     Evidence Developed in Habeas Proceedings Before 2016 Remand

#### 1.     Trial Counsel's Affidavits

In early 2013, Vasquez and Martinez submitted affidavits in response to the trial court's order designating issues. Martinez said that his strategy—given Applicant's admissions to police—was to portray the murders as an "irrational, spontaneous, and unanticipated act of the individual gunm[e]n at the scene of the crime" and argue that Applicant participated only in planning the robbery, not the murders. He stated that, at punishment, counsel sought to show that Applicant should not be executed because he was not present at the crime scene and did not have any role in the killings. They argued that Applicant did not have a violent prison record, had been incarcerated when he was a child, and had been neglected by his father. He said that, to investigate mitigating evidence, they interviewed Applicant, Applicant's mother, and several family members. Martinez said that they also reviewed the prosecutor's files and Applicant's prison and juvenile records, including psychological and medical evaluations. Martinez said that he

saw no evidence that Applicant had experienced trauma or had any mental health disorders. Vasquez's answer on many of the issues was: "Discussed case with Defendant and family" or "Ask Ralph Martinez."

### 2. Testimony from the 2014 Habeas Hearing

Martinez, who lived in Houston, testified at the 2014 writ hearing that Applicant's mother hired him to serve as lead counsel in Applicant's 2005 capital murder trial. The trial judge appointed Vasquez as local counsel to assist him. Martinez controlled the presentation of the defense case. Vasquez questioned no witnesses except one on voir dire. Martinez admitted that he was not on the capital murder case appointment list. He indicated that Applicant's case was the only death-penalty case that he had handled. Similarly, Vasquez was not on the capital case counsel list and had no capital murder experience.

Martinez said that he knew that the trial court would have appointed a defense investigator because the court had appointed second-chair counsel. However, Martinez did not ask the court to appoint an investigator or a mitigation specialist. Martinez claimed that he did not need an investigator because he "felt that this case came down to" Applicant's statement to police admitting his involvement in this offense "in terms of organizing a robbery, but not a killing." and that he did not need a mitigation specialist because "there wasn't that much mitigation in this case . . . ."

Martinez said that he and Vasquez conducted the investigation themselves and that

they interviewed Applicant, Applicant's mother, and some other family members.[6]

Vasquez stated that Applicant's mother was Martinez's primary contact. Martinez also

filed motions provided to him by a co-defendant's attorney, including a motion that

incorrectly referred to Applicant as "a black man who is awaiting retrial." Neither

Martinez nor Vasquez were familiar with the *Wiggins* case. Martinez indicated that his

defensive theory was that Applicant was not the shooter and was not present when the

shootings occurred. Martinez indicated that, at punishment, he basically urged the same

theory—even though the jury had already rejected that argument and convicted Applicant.

He also presented meager mitigating evidence.

Martinez said that he relied on "what the family members" and Applicant's mother

told him. He said that Applicant's mother told him, "I gave [Applicant] a good home. I

was a good mother. He had a happy childhood, except for his father, but [his father] was

not around that much." Martinez never spoke to anyone from Applicant's father's family.

He did not ask family members about substance abuse or drinking in the family. He also

did not ask Applicant's mother whether she drank alcohol during her pregnancy with

Applicant. Martinez said that he asked Applicant's mother to bring Applicant's school

records to him, but she never did. He did not obtain the school records on his own, and he

did not know what was in those records. Martinez relied on Applicant's family's

---

[6]Vasquez also remembered interviewing an African American woman. He could not remember any specifics about this woman and said that she did not testify.

assertions that Applicant was a good student.[7]

Martinez said that Applicant was "an intelligent guy who [was] not in any way disrespectful." Martinez never arranged for Applicant to be evaluated by a mental health professional because Martinez thought that Applicant "gave no indication of having mental issues. . . . His family told me he never did. I didn't see anything in observing him that would indicate that." Martinez conceded that Applicant's mother might have mentioned something about Applicant's treatment at Tropical Texas Center for Mental Health and Mental Retardation for nightmares, but he did not follow up on this information or obtain these records. Martinez stated that Applicant's mother said that Applicant "was a healthy young man and had no mental issues at all."

Even though he knew that Applicant had been incarcerated in TYC and TDCJ, Martinez did not interview correctional counselors from those agencies.[8] Martinez said he reviewed "some TYC psychological evaluation," but he decided that "[i]t wasn't anything to me that was that important."

### 3. TYC Records and Psychological Evaluations

The TYC records and associated psychological evaluations of Applicant from 1990 and 1991 contain extensive information about Applicant's history and psychological

---

[7]The record shows that Applicant's academic record began to decline in the seventh grade when he started using drugs. He dropped out of school in the ninth grade and failed his GED examination the first time he took it.

[8]The record indicates that the State's file—which was disclosed to the defense—contained the TYC records.

problems. The records indicate that Applicant was placed on probation for a harassment offense in 1989 when he was 15 years old. In September 1990, Applicant pled true to a terroristic-threat charge stemming from an incident earlier that year.[9] By 16 years old, Applicant had received eight TYC referrals and two adjudications. His probation officer observed that Applicant did not worry about consequences.

The TYC records state that Applicant was referred to the "Texas Key Program," but  he failed to complete the program. These records mention that Applicant exhibited a negative attitude, broke curfew, associated with negative peers, refused to attend planned group activities, and verbally abused his mother and his girlfriend. Applicant told a psychologist that he tried to cut his wrist as part of a suicide gesture during a depressive mood, and that, while driving, he contemplated flipping the car to kill himself.

The records also show that, at one time, Applicant was receiving twice-monthly outpatient counseling from Texas Tropical Mental Health and Retardation Center. The records state that Applicant "has some very negative peers who are much older than [he is]. He along with his friends have a weakness for taking cars without the owners['] permission." The author speculated that "[c]ontributing factors have been the fact that his father has been in and out of jail for most of [Applicant's] life. His mother has tried to make up by providing materialistic things and making excuses for his unacceptable behavior." The records document Applicant's admission at age fifteen that he had been

---

[9]Six months earlier, in March 1990, Applicant's father was sentenced to prison after he and his accomplices robbed people while posing as DEA agents.

drinking vodka heavily and free-basing cocaine.

A probation officer's report in the TYC records stated: "It is this probation officer's opinion that [Applicant] was left to be on his own for extended time periods while [his] mother was out with [her] friends or [her] boyfriend." The officer opined that Applicant saw his mother as a "lifesaver when he [was] in trouble" and there was not "much affection otherwise." The officer described Applicant's home life as a "broken family structure where there [was] no discipline or structure." The officer said that Applicant's mother was "extremely lenient" and gave Applicant material things "in order to make up for the father's absence." The officer observed that, when with his friends, Applicant "love[d] to party as much as possible, and not worry about consequences." The officer opined that Applicant was a "spoiled young man who [would] throw a tantrum if he [did] not get his way" and "refuse[d] to take responsibility for his actions." The officer further stated that Applicant had "expensive taste for clothes" and was a "sharp dresser" who was "very bright" and could "communicate verbally very well."

A May 1990 psychological evaluation documented Applicant's suicidal gestures and moderately severe depression. The report stated that, as a young child, Applicant "witnessed a murder which left him greatly traumatized." The report emphasized that Applicant missed his father, who had been in prison for as long as Applicant could remember. The report stated that Applicant had low self-esteem and often felt guilty about the things he had done.

The report included Applicant's results on the Stanford-Binet Intelligence Scale, which were in the average range of general intelligence. The doctor recommended treatment for depression and a developing substance abuse disorder. He recommended counseling or therapy for PTSD, low self-esteem, and depression, stating that Applicant presented a mild risk of suicide.

A psychological evaluation conducted about six months later in December 1990 noted that Applicant witnessed a murder, that he had depression, and PTSD, and that he suffered from polysubstance abuse. The doctor noted that Applicant was "intellectually capable of obtaining his high school diploma if he were motivated." The doctor also stated that Applicant was rebellious and non-conforming and "enjoy[ed] the thrills and excitement of breaking the law." The doctor observed that Applicant expressed concern about losing his temper and "problems with being pushed into sex[,]" but Applicant "would not elaborate on this area." The report noted that Applicant "like[d] fast cars and hated being locked up" and "carried a gun most of the time." The report also noted Applicant's "crying and depression over family matters."

The doctor reported an undifferentiated conduct disorder and "Psychoactive Substance Abuse." The doctor concluded that Applicant was "a 16 year old that [had] experienced some extreme traumas in his life." He had "average intellectual abilities, but [was] behind in his academic skills." The doctor observed that, when frustrated with his abilities, Applicant would "become a discipline problem." Further, he concluded that

Applicant's "personality profile reflect[ed] strong antisocial behaviors." He said

Applicant did "not like to be caught" and "there [was] not much open display of guilt for

stealing or harming others." The doctor cautioned: "These problems are becoming

ingrained and will be difficult to change."

In 1991, Applicant was charged with attempted murder for stabbing someone. The

McAllen Psychological Center prepared a report which referenced a course of treatment

for sleep-related problems when Applicant was in the third or fourth grade. The report

also mentioned that Applicant had received mental health treatment at the Charter

Counseling Center when he was 14 years old for anger-management problems. The report

noted that Applicant admitted physically abusing his girlfriend and sometimes

"thrash[ing] his room." It also stated that Applicant spent much of his time away from

home with his friends and that his mother did not discipline him. The report further stated

that Applicant "did not feel any sympathy for the victim [he stabbed] because he felt [the

victim] had provoked the incident." The evaluation contained the following summary:

> Present testing did not reveal any serious mental disorder that would
> interfere with [Applicant's] judgement [sic] and reasoning abilities. There
> was no evidence of any delusional thinking nor other formal thought
> disorder. His level of intelligence falls within the average range. There was
> no evidence of any intellectual deficits nor organic brain dysfunction.
> Present testing primarily reveals a young man who has experienced
> significant disappointment in his life, most importantly the absence of a
> father figure. The separation from his father contributed to fairly chronic
> levels of depression and hostility as well as a tendency to avoid close
> psychological involvements due to an expectation of disappointment and
> hurt in relationships. His feelings tend to surface in outbursts of anger or
> self destructive actions. He may also be abusing alcohol and is likely to

become stormy and destructive during times of drinking. His father's antisocial history also provided a poor role model for [Applicant]. . . . [Applicant's] mother may have also assumed a rather lax approach to discipline[,] which did not bode well for him.

The 1991 report specifically addressed the implications of Applicant's test results on his responsibility for his conduct: "[Applicant] does not exhibit any mental disorder that would impair his judgement [sic] and reasoning abilities. He clearly understands right from wrong. . . . [Applicant] appears to be responsible for his conduct."

**B.      The Trial Court's 2015 Findings of Fact and Conclusions of Law**

The trial court's 2015 findings of fact and conclusions of law recount Martinez and Vasquez's statements during the hearing in detail and find their statements to be credible. The findings describe Martinez's testimony that he relied on what Applicant, Applicant's mother, and other family members told him, and what was contained in the prosecutor's file. The findings note that Applicant's mother "kept insisting that she was a great mom and had provided a good home for Applicant." The findings state that "nobody had told [Martinez] that Applicant had any type of psychiatric or mental problems" and "that no one had told [Martinez] about Applicant's mother['s] drinking, including while she was pregnant."

The trial court found that counsel's decisions not to hire a mitigation specialist and not to have Applicant evaluated by a mental health professional represented valid strategic choices. The court concluded that Applicant did not demonstrate deficient

performance and recommended that this Court deny relief. The trial court made no specific finding on *Strickland*'s prejudice prong regarding this ground for relief.

### C. This Court's March 2016 Remand Order

In March 2016, this Court remanded Applicant's third allegation—the deficient-mitigation-investigation claim that is the subject of this opinion—to the trial court for further development. *Ex parte Garza*, No. WR-78,113-01, 2016 WL 1161263, at *2 (Tex. Crim. App. Mar. 23, 2016) (per curiam) (not designated for publication). In our order, we noted evidence suggesting that Applicant's trial counsel relied solely on Applicant's mother to provide mitigating information, locate witnesses, and obtain school records. *Id.* We also noted that counsel failed to retain a mental health expert, despite prior evaluations suggesting that Applicant had suffered childhood trauma and had mental health issues. *Id*. We concluded that Applicant had alleged facts which, if true, might entitle him to relief: "[I]t is arguable that counsel's failure to obtain any investigative or expert assistance, particularly when Applicant's prior psychological evaluations indicated trauma and mental health problems, constituted deficient performance." *Id*. Accordingly, we ordered the trial court to gather information and enter findings as to whether, but for counsel's failure to conduct a more thorough mitigation investigation, the result of the proceeding would have been different. *Id*. On remand, Applicant's habeas counsel submitted additional evidence and the parties filed proposed supplemental findings of fact and conclusions of law.

**D.      Additional Evidence Developed in Habeas Proceedings**

In support of his third allegation, Applicant submitted over fifty exhibits. These include official documents, several experts' evaluations and reports, and affidavits from family members, attorneys, and others. Many of these exhibits repeat certain facts and themes.

**1.      Affidavits of Family Members and Associates**

Applicant's mother submitted affidavits containing the following information:

- She married Applicant's father when she was 17 years old in a "shotgun wedding."

- She never wanted children. When she was three months pregnant with Applicant, her grandmother took her to Mexico where a pharmacist gave her a "shot" to end her pregnancy. Applicant was born six months later.

- Applicant's father beat her when she was pregnant with Applicant and "punched" her in the stomach "more than once."

- She started drinking when she was 13 years old. While pregnant with Applicant, she drank about one 24-ounce beer per day. She "lived for the weekends" when she would typically drink "a case of beer" by herself. She drank throughout Applicant's childhood and quit in 1997.

- The family lived in a small home on a larger property with a lot of family members. She said that she was touched inappropriately by her grandfather "on his death bed." She also said that she was sexually abused by at least eight other family members and "acquaintances."

- When Applicant was about 5 years old, his father went to prison for a drug offense. Applicant's father was a thief and a drug dealer who was in and out of jail.

- Applicant's father sexually abused her younger sister, and she "always suspected" that he did it in front of Applicant.

- Applicant slept in her bed and had problems sleeping while his father was in prison.

- She whipped Applicant when he misbehaved. When Applicant's father thought that Applicant was misbehaving, he would take Applicant outside and put him in the back seat of the car, lock the doors, and leave him there for "up to an hour."

- She dated a man for four years who was cruel to Applicant and called him a "bastard." She traveled to Mexico with this man and left Applicant at home alone.

- A family moved in with them for a period of time. When Applicant was about 10 years old, he witnessed the father of this family being fatally shot in the head. Applicant never received counseling for this traumatic experience.

- She and her family met with Applicant's lead trial attorney, Martinez, about eight times. Martinez asked her to give him names of Applicant's teachers and friends. She went to the schools to try to locate teachers who could testify. She gave Martinez a list of names of people he could contact. To her knowledge, Martinez never tried to locate people. She would usually contact the people and have them meet Martinez at a hotel.

- Martinez never asked questions about her pregnancy, whether she or anyone else in her family drank, or about any physical or sexual abuse. She volunteered information about the shooting that Applicant witnessed and his father's incarceration and death.

- Applicant received certificates for successful completion of various educational programs in TDCJ, including his GED, cognitive intervention, and job training.

- Martinez told her that he would do all the legal work in the case himself and that the other things that she was doing (regarding

sentencing) were only in case they were needed. He was hoping that Applicant's confession would be thrown out and that would be the end of the case.

- She only met Applicant's other trial attorney, Vasquez, a few times, and he did not ask her about Applicant's childhood.

- If counsel had interviewed her at length about Applicant's childhood, she would have told them this information.

Applicant's paternal aunt signed an affidavit admitting that she sexually abused Applicant when he was 5 or 6 years old and she was 13 years old. She explained that her brother (Applicant's father) molested her from the time she was about 6 years old until she was about 12 years old. She theorized that this experience caused her to molest Applicant. She described her sexual abuse of Applicant as "mostly fondling" that occurred at least two or three times over the course of a summer when Applicant slept in her bed. She said that she would allow Applicant to touch her breasts and put his mouth on her breasts. She also allowed him to touch her "female private parts." She said that no one interviewed her before Applicant's trial. She said that, if someone had taken the time to talk to her and make her "feel comfortable enough to disclose this extremely personal and sensitive information," she would have disclosed the abuse.

Other witnesses gave statements indicating that:

- Applicant and his mother lived with other extended family members in crowded conditions on a ranch with many people, animals, abandoned cars, drugs, and guns. Applicant was the oldest of his cousins and the other children "looked up" to and "gravitated towards" him.

• Applicant's mother acted in a selfish manner. She was not "motherly" or affectionate to Applicant.

• Applicant was attached to his grandmother who treated him "really special" because he was her first grandson. She lost a difficult battle with cancer, and Applicant was present when she died.

• When Applicant was in his early teens, his mother spent a lot of time in Mexico visiting her boyfriend and left Applicant alone. The boyfriend was an "asshole" who physically abused Applicant and his mother.

• Applicant's father's only source of income was dealing and stealing drugs. He was one of the "first guys in the Valley" to implement the "pseudocop" technique—"robbing people while wearing a cop uniform."

• Law enforcement "raided" the ranch about three times. These raids occurred at night, involved helicopters, and usually ended with Applicant's father's arrest.

• Drug use and drug dealing were common in the extended family, and Applicant and his cousins were exposed to drugs at a young age. The cousins were "encouraged to do drugs." A cousin stated, "Everyone smoked marijuana and drank a lot and they fed marijuana to the horse."

• Applicant's father was "bad news." He sexually assaulted several female family members. He would yell at Applicant's mother and she would not yell back. He beat her when she was pregnant with Applicant and he did not come to the hospital with her when she was in labor. When Applicant's father was out of prison, he was always yelling at Applicant and putting him down. He would hit Applicant in the head.

• Applicant's father was generous with money. Whenever he was out of prison, he would "spoil" Applicant by buying him things. For

example, he bought Applicant a Corvette before Applicant had a driver's license. Applicant "idolized" his father.

• As a small child, Applicant was seated in a car with the door open when a man was murdered in front of him. Applicant had a "perfectly clear view" as the man was shot in the head and fell to the ground with blood "gushing everywhere." The murderer told Applicant and the victim's two sons to leave or the same thing would happen to them. Applicant had been a "nice kid" but, after this murder and his father's incarceration, he became "moody" and "didn't smile as much."

• As a teenager, Applicant was very angry. He would punch holes in walls and steal cars. He would hide the cars on the ranch and would take the younger cousins joyriding in the stolen cars. When he went to prison, he joined a gang.

• Sometimes Applicant did farm work "harvesting and hauling vegetables for [the] Morales trucking company." His uncle stated: "Everyone loved working with [Applicant]. My dad tried to advise [Applicant] to stay working on the farm, but [Applicant] didn't want to."

• When Applicant got out of prison in 2002, his mother helped him buy a truck. His uncle gave him a job doing manual labor, but it only lasted a short time before Applicant was arrested again.

• One maternal aunt looked after Applicant when his mother was away. She cared about Applicant and tried to make sure he came home safely when he went out at night. On one occasion, this aunt saw Applicant hitting abandoned cars with a bat. He was "sobbing uncontrollably." He told her that he "felt all alone[;] that he felt like . . . he did not have a mother or father."

Applicant's younger half-brother provided an affidavit discussing their father's

criminal life, monetary generosity, and extensive prison time. He said that he was forced

to care for his own drug-addicted mother (Applicant's stepmother)and that their father told him shortly before he died that Applicant was a "lost cause."

Most of the above witnesses said that Applicant's trial counsel never interviewed them. Other witnesses said that they were interviewed but were not asked about Applicant's childhood. Many of them said that, if counsel had asked them, they would have shared this information and testified for Applicant.

### 2. Medical and Psychological Experts' Evaluations and Reports

Applicant submitted expert affidavits/reports from the following doctors: Craig Henderson, Ph.D., Assistant Professor of Psychology at Sam Houston State University, Paul D. Connor, Ph.D., a clinical psychologist with a specialization in neuropsychology, Richard S. Adler, M.D., a board-certified adult, child, and adolescent psychiatrist who is Medical Director of "FASDExperts ,"[10] and Natalie Novick Brown, Ph.D., a psychologist licensed in Washington and Florida who is Program Director of "FASDExperts."

In 2007, Henderson conducted two extensive life-history reviews of Applicant and prepared a report. He explained in his report that Applicant was neglected as a child, which made him more susceptible to mental health problems later in life and led to "a proclivity to enter [into] relationships somewhat naively." Applicant suffered "multiple traumatic experiences," including sexual abuse by a 13-year-old aunt, his father's

---

[10]Fetal Alcohol Spectrum Disorders (FASD) "is an umbrella term for a number of diagnoses all of which are the result of the toxic effects of alcohol on the developing fetus."

incarceration, and his grandmother's death. He also witnessed a shooting. He said that Applicant may have "untreated PTSD." Henderson opined, "[Y]outh with complex trauma are at risk for a number of behavioral difficulties in adolescence: (1) poor impulse control; (2) self-destructive behavior; (3) substance abuse; (5) [sic] difficulty understanding and complying with rules; and (6) criminal activity." Henderson stated that Applicant's mother's lack of emotional support exacerbated the effects of the trauma.

Henderson stated in the report that, when Applicant moved in with his father as an adolescent, he began smoking marijuana daily with a stepbrother and his performance in school declined. Henderson said Applicant's family environment encouraged drug use, which impairs judgment even when the drug user is not intoxicated. Henderson also opined that Applicant met the criteria for "dysthymic disorder," which is characterized by persistent depressed mood that lasts for two years or longer. However, Henderson said that Applicant received group counseling at TYC and received substance abuse intervention from one of his aunts upon his release from TDCJ in 2002.[11] This intervention was relatively successful because Applicant claimed that he did not test positive for drugs.

---

[11]The expert also said that "it is possible that the closeness of this family relationship may have impaired her objectivity, competence, or effectiveness in performing her functions as a treatment provider, a point clearly noted in the American Psychological Association's (2003) Ethical Principles of Psychologists and Code of Conduct."

Henderson reported that Applicant was sent to prison at a young age and formed relationships with gang leaders who reached out to him because his father was a gang leader. Henderson stated that Applicant committed the current offense about eight months after he was released from prison. Henderson recommended a comprehensive neuropsychological evaluation to look for neurological impairment in critical functions and neurological abnormalities associated with possible fetal alcohol syndrome.

In a later supplemental affidavit, Henderson said that he would have been available to evaluate Applicant at the time of his trial and consult with trial counsel. He also emphasized that Fetal Alcohol Spectrum Disorder (FASD) was well known at the time of Applicant's trial, noting that he was taught basic facts regarding this disorder during his training as a graduate student between 1995 and 2001.

The other three doctors' reports included the following information: Applicant's full-scale IQ was measured at 89, indicating performance within the low-average range. Connor explained, "[Applicant] has undergone testing of intellectual functioning on three prior occasions. . . . Overall, [Applicant's] IQ was found to be fairly consistently within the average range." Applicant's elementary school records indicated weaknesses only in math and handwriting. But in seventh grade, when Applicant started using drugs, all his grades dropped. Connor reported that Applicant's post-conviction evaluations indicated deficits in nine domains of functioning, including math computation, attention and impulsivity, suggestibility, executive functioning, daily living skills, and socialization

abilities. Connor stated that Applicant's pattern of neuropsychological performance was consistent with the 2004 Centers for Disease Control and Prevention's neuropsychological guidelines for FASD diagnosis. These guidelines require that a minimum of three domains of cognitive functioning fall at least one standard deviation below average and/or intellectual functioning within the intellectually disabled range. An individual FASD diagnosis requires an evaluation by a medical doctor.

In 2013, Adler conducted a psychiatric interview and physical examination of Applicant. Adler reviewed an affidavit from Applicant's mother and the reports of the other doctors who have examined Applicant. Adler stated that he had testified as an expert witness on FASD in at least twenty-one cases. Adler documented more information obtained through the interview and physical examination of Applicant, including:

- Applicant reported a history of "head banging" against the wall "for hours" once or twice a week when he was around four to six years of age. Applicant said that he did this to punish himself when his parents were angry with him.

- Applicant reported that his mother's boyfriend "roughed [Applicant] up a few times and made [Applicant] jack him off after." Applicant also reported that the sexual abuse by his 13-year-old paternal aunt (described above) went on from when he was "age four to [age] seven."[12]

---

[12]Applicant's account differs from that of his aunt, who reported that the fondling occurred over the course of one summer.

- Applicant said that his closest attachment when he was young was to his father. He described his father's personality as "awesome . . . a fun person to be with." Applicant told Adler that his father spoiled him and bought him toys, such as go-karts and four-wheelers. Applicant described his father as "a great person."

- Applicant's "motoric activity was within normal limits and there were no tics, twitches, stereotypies . . . nor any other abnormal involuntary movements noted." He also did not exhibit any delusions or hallucinations.

- Applicant "rated his mood as 1 on a scale of 1 (lowest) to 10 (highest). His affect was consistent with his stated mood, without any grossly bizarre or inappropriate features."

- Applicant denied any suicidal ideation but said "death surrounds me."

- Applicant reported that he sleeps only four to five hours each night, indicating that this has been a lifelong problem.

- Applicant's hands had an unusual appearance. On the right side, there was an abnormal curve to his fifth finger (inward) and there appeared to be a "Hockey Stick crease" on both palms. Adler opined, "Hockey stick creases are often found in the persons with FASD."

As a result of his examination of Applicant and his review of the materials described above, Adler opined "with reasonable medical certainty" that Applicant had "Neurodevelopmental disorder associated with prenatal alcohol exposure." Adler said that Applicant also met the diagnostic criteria for Alcohol-Related Neurodevelopmental Disorder (ARND), a type of FASD. Adler also diagnosed Applicant with "Persistent Depressive Disorder (Dysthymia), Early Onset, Moderate to Severe" and "Posttraumatic Stress Disorder, by history (childhood)."

Novick Brown opined that Applicant exhibited severe coping deficiencies and PTSD from the traumatic loss of his grandmother, his mother's abandonment of him for her boyfriend, and seeing a man being shot in the head at close range. She said that Applicant was particularly susceptible to PTSD because of his pre-existing FASD. She asserted that having both disorders further impaired his coping abilities. Novick Brown opined:

> The instant offense was the same kind of [pseudocop] robbery that [Applicant] had observed his father do. From [Applicant's] impaired perspective, if the father whom he idolized did such crimes, then modeling that behavior would seem normal.

> \*     \*     \*

> Due to his FASD and associated impairments, [Applicant] did not have the cognitive capacity to resist the antisocial role modeling in his environment. Thus, he was prone to gang involvement by virtue of his mental defect. Review of information regarding the instant offense indicates it was ill[-]conceived, badly planned, and poorly executed. In short, this crime, as well as [Applicant's] prior criminal history, is consistent with FASD.

Connor, Adler, and Novick Brown all stated that they were available for consultation and testimony about FASD at the time of Applicant's trial. They also identified other experts, including neuropsychologists and medical doctors, who would have been available to consult with counsel concerning FASD at the time of trial.

### 3.    Other Evidence Submitted by Applicant

Habeas counsel submitted Applicant's declaration stating that, at the time of the offense, "The truth is that I was no longer a member of the [Tri-City Bombers]."

Applicant said that a high-ranking gang official told him to have Kreeper bring the guns and Applicant "did what [he] was told because [he] was afraid of what they would do to [his] family." He stated that he "knew that the [Tri-City Bombers] gang had killed its own members before, and for less reason." Applicant claimed that he told the detective "some things that were not exactly true" about being a captain in the Tri-City Bombers because he "thought that would help [him] to get a good plea bargain."[13] Applicant further stated that his trial attorneys never asked him "about being sexually abused as a child." He asserted that he would have told them about the sexual abuse if they had asked.

Jeanette Broshears, who had been Applicant's TYC caseworker at the Evins Regional Juvenile Center facility in 1991, signed an affidavit in which she expressed frustration with TYC's services in Applicant's case. She stated that Applicant's experience in TYC "is almost a textbook case of a vulnerable young individual who had been subjected to previous traumas and life stressors being inadequately provided for by the agency assigned to supervise him." Broshears noted that Applicant "did well at Evins and had no incidents that sent him to security." She faulted TYC for not providing Applicant with the treatment and services recommended in the psychological evaluations in the file. For example, she observed that "counseling for PTSD was recommended, but it does not appear that that recommendation was followed in any way." An anger control group was recommended, but Applicant received only general group counseling. Further,

---

[13]The trial court's findings describe Applicant's declaration as "self-serving."

Broshears said, the Addictions Program at the Texas Key Program could have benefitted Applicant, but this resource was not made available to him. Broshears stated that she could have assisted Applicant's defense attorneys and could have referred them to other witnesses named in Applicant's TYC file, but they never contacted her.

The habeas record indicates that Applicant had a "lengthy major disciplinary history" in TDCJ. He committed several disciplinary offenses while incarcerated, including repeated fighting with other inmates, possessing a weapon (a three-and-a-half-inch piece of metal with a two-inch blade), and stabbing another inmate with a handmade weapon. Applicant was released on parole in April 2002. He committed the instant capital murder in January 2003.

Applicant's first attorney, Banker, stated in an affidavit that he focused on doing "whatever [he] could to prevent the case from going to trial." He said that he did not conduct a mitigation investigation. He withdrew in October 2004 (jury selection commenced on February 14, 2005).

Richard Burr, an experienced death-penalty attorney said that, "An essential component of preparing a mitigation case is the development of any issues concerning the client's mental health and cognitive functioning that might support a sentence less than death." He also said that, had Applicant's trial counsel sought assistance from well-known criminal defense organizations or consulted the ABA Guidelines, "they could have readily located appropriate resources and assistance" and would have learned "the

importance of a mitigation investigation, including an in depth mental health evaluation[.]" Another attorney, Philip Wischkaemper, opined that counsel could also have identified key issues like FASD and experts who could have testified about FASD or other mental health issues if he had sought professional assistance with the case.

### E. The Trial Court's Supplemental Findings of Fact and Conclusions of Law

In May 2017, the trial court entered an order adopting the State's 207-page supplemental findings of fact, conclusions of law, and recommendation to deny relief. In its supplemental findings of fact and conclusions of law, the trial court reiterated many of its previous findings that trial counsel's conduct did not constitute deficient performance. Despite this Court's 2016 remand order directing the trial court to determine whether, but for trial counsel's failure to conduct a more thorough mitigation investigation, the result of the proceeding would have been different, the trial court entered very few findings and conclusions regarding the issue of prejudice.

The trial court noted that the reports prepared by Henderson and Novick Brown contained "double-edged" information "which would certainly have been brought out by the State had these individuals testified" and "would clearly have been more detrimental than beneficial to the defense." Summarizing Applicant's criminal record, the trial court found that the evidence of his future dangerousness was overwhelming. The court stated that it is "virtually impossible to establish prejudice" where the evidence supporting

"future dangerousness is overwhelming." *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) (citing *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002)). Also, the trial court found:

> [P]resentation of evidence that Applicant suffered from Fetal Alcohol Syndrome Disorder [sic] would not have had any effect on the jury, which had rejected consideration of other potentially mitigating evidence about Applicant's childhood and Applicant having witnessed a murder as a child as mitigating factors.

## V. Analysis

The record reflects that trial counsel relied almost exclusively on the assistance of Applicant's mother to locate witnesses, records, and information in the mitigation investigation. Applicant's mother defended her own parenting abilities and represented that their household and his childhood had been normal except for the absence of his father. When Applicant's mother did not produce the requested school records, counsel did not try to obtain the records themselves. Applicant's mother found potential witnesses from her own family and brought them to a hotel to talk to counsel in a group, but she did not include witnesses from Applicant's father's family. Counsel did not interview the witnesses separately or ask them specific questions about sensitive matters, such as alcohol and drug use.

Moreover, even though counsel knew that the trial court would have appointed an investigator for Applicant, counsel declined to seek any investigative or expert assistance in conducting the mitigation investigation and in assessing Applicant's mental health.

Counsel made this decision despite the "red flags" evident in TYC documents in the

State's file. These red flags included information that Applicant had received mental

health treatment services, suffered from persistent depression and PTSD due to childhood

trauma, had experienced suicidal thoughts, as a teenager engaged in serious substance

abuse, had anger-management issues, and reported "problems with being pushed into

sex." In sum, the record indicates that counsel failed to investigate or fully develop

several types of mitigating evidence, including evidence indicating that:

- Applicant suffered from PTSD due to childhood trauma.

- Applicant's mother was a heavy drinker, he was exposed to alcohol in the womb, and Adler diagnosed him with a type of FASD.

- Applicant suffered from "Persistent Depressive Disorder" and experienced occasional suicidal ideation in adolescence.

- Applicant was raised in a dysfunctional extended-family environment characterized by drug trafficking, violence, sexual abuse of female family members, and pervasive alcohol and drug abuse.

- Applicant's FASD and PTSD made it "psychologically difficult for [him] to resist the antisocial role modeling in his environment."

- Applicant abused alcohol and cocaine during adolescence.

- Applicant's parents neglected him, failed to supervise him, and spoiled him with "lavish material gifts[] bought with drug trafficking proceeds."

- Applicant idolized his violent, often-incarcerated, gang-member father who pioneered the type of "pseudocop robbery" that Applicant committed in this case.

- At age five or six, Applicant was molested by his 13-year-old aunt who has admitted this conduct but stated that it consisted of "mostly fondling."

Applicant's trial counsel's open-ended questions of family members—often in a group setting—were not sufficient to elicit the kind of sensitive information counsel needed to develop mitigation evidence in this case. And there is no evidence that either one of Applicant's trial attorneys had the expertise to decide whether Applicant had any mental illness or dysfunction without the assistance of a qualified expert.

The United States Supreme Court has recognized that an attorney's failure to uncover and present voluminous mitigating evidence at sentencing is not a reasonable tactical decision where counsel has not "fulfilled their obligation to conduct a thorough investigation of the defendant's background." *Wiggins*, 539 U.S. at 522 (citing *Williams*, 529 U.S. at 367). In assessing whether an attorney's investigation was reasonable, a court "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527. "When trial counsel does not conduct a complete investigation, his conduct is 'reasonable only to the extent that reasonable professional judgments support the limitations on investigation.'" *Id*. at 533. Further, this Court has held that "an objective standard of reasonable performance for defense counsel in a capital case would have

required counsel to inquire whether the defendant had been abused as a child." *Gonzales*, 204 S.W.3d at 397.

Based on our own review of the record,[14] we conclude that Applicant's trial counsel did not fulfill their obligation to conduct a thorough investigation of his background. *See Wiggins*, 539 U.S. at 522. In light of the totality of the mitigation evidence and the information available to counsel at the time of Applicant's trial, we hold that counsel's representation fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 688.

Next, we must address *Strickland*'s prejudice prong. In determining whether prejudice exists, we cannot ignore the powerful aggravating evidence adduced at Applicant's trial. We note the heinous nature of the offense at bar, a pseudocop robbery perpetrated by the Tri-City Bombers in which Applicant's gang murdered six people. When interviewed by a detective about his involvement in this offense, Applicant voluntarily offered that he was not only a member of the Tri-City Bombers, but he was the gang's local captain (a "rather high ranking" leader). Applicant admitted to law enforcement that he recruited the gang participants in this robbery, arranged for the delivery of the firearms that the gang members used, planned the crime, and facilitated its execution. We similarly conclude that Applicant was prejudiced because there is a

---

[14]*See Reed*, 271 S.W.3d at 727 ("When our independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record, we may exercise our authority to make contrary or alternative findings and conclusions.").

reasonable probability that, but for defense counsel's deficient investigation, at least one juror would have struck a different balance, voting to spare Applicant's life. *Wiggins*, 539 U.S. at 537; *Gonzales*, 204 S.W.3d at 394; *see Andrus*, 140 S. Ct. at 1886.

Trial counsel's punishment case was underwhelming. He told the jury during opening statements that he would present some mitigating evidence, but he failed to support most of his allegations with the promised evidence.[15] The State capitalized on that shortcoming, telling the jury that "[t]here has been no evidence of everything that he talked about during his opening; no traumatic event in his childhood, no major change in his life." Compared to the meager mitigating evidence presented at the punishment trial, the new mitigating evidence is voluminous and paints a starkly different, more detailed, and more nuanced, picture of Applicant's childhood and formative years. That evidence includes a wealth of information about how parental neglect and incarceration, sexual and physical abuse, extreme violence, and exposure to drug-dealing and substance abuse influenced Applicant's upbringing. It also shows that Applicant suffered from PTSD from an early age and that, because it was left untreated, Applicant developed other mental health problems like chronic depression and suicidal ideations. It also shows that Applicant likely suffers from FASD.

---

[15]For example, the State points out in its brief that trial counsel "presented evidence that Applicant had witnessed a murder, but did not present evidence that he suffered from [PTSD] as a result . . . ." State's Brief on the Merits at 58.

The State, relying on the habeas court's findings and conclusions, argues that the expert's reports about PTSD and FASD do not help Applicant to show prejudice because the expert's reports were "double-edged" evidence. We agree that the reports are "double-edged," but as we noted earlier, that is not dispositive of the prejudice analysis. We consider *all* the evidence from trial and the habeas proceedings, even if it is "double-edged." *Penry v. Lynaugh*, 491 U.S. 312, 315 (1989) (considering Penry's evidence of intellectual disability and history of abuse, while acknowledging that it was "a two-edged sword"); *see Soliz v. State*, 432 S.W.3d 895, 904 (Tex. Crim. App. 2014) ("[E]vidence of brain damage resulting from partial fetal-alcohol syndrome is relevant evidence that may be considered by the jury . . . . Weighing of this type of evidence is a subjective determination undertaken by each individual juror."). The Fifth Circuit recognized this principle when it noted that "[d]ismissing . . . FASD out-of-hand as 'double-edged' is problematic . . . ." *Trevino v. Davis*, 829 F.3d 328, 351 (5th Cir. 2016).

Some evidence is "double-edged" by its nature, like PTSD or FASD diagnoses. Some jurors might think that those afflictions lessens a defendant's moral blameworthiness for committing the offense for which he is on trial, while others might think that people who suffer from PTSD or FASD (or both) are more likely to be a danger in the future because they might have a propensity to be short-tempered, violent, or to have lessened impulse control, etc. In other words, jurors could look at the same evidence and draw reasonable, but conflicting conclusions.

On the other hand, some newly available information is "double-edged" because, like the reports in this case, they contain mitigating circumstances, but also information about aggravating circumstances previously unknown to the jury. This type of "double-edged" evidence falls on a spectrum: On one end, the evidence might contain a wealth of new information that is mitigating in nature, and present only minor, new aggravating circumstances. On the other end, the evidence might contain little new information that is mitigating in nature, but also include significant aggravating circumstances that were previously unknown to the jury.

Although these types of evidence are "double-edged," they could nonetheless tip the scales of the prejudice analysis when the entirety of the available mitigating evidence is considered.

This is a close case. We recognize that the aggravating evidence is substantial, showing that Applicant had an extensive criminal history and disciplinary history while incarcerated. And that it shows that Applicant recruited members of his gang to commit the robbery, that he arranged for the delivery of the firearms that the gang members used, that he help plan the crime, and that he facilitated its execution by acting as a getaway driver. But we think that the habeas mitigation evidence would have provided jurors with important context about Applicant's life that trial counsel failed to present and that would have drawn a considerably different picture for the jury of Applicant's childhood and mental health than what it was presented with at trial. *Andrus*, 140 S. Ct. at 1887 (stating

that the prejudice inquiry requires courts to "'speculate' as to the effect of the new evidence" on the trial evidence). After considering the entirety of the currently available evidence of mitigating and aggravating circumstances, we conclude that Applicant is entitled to a new punishment trial because there is a reasonable probability that, but for counsel's deficient investigation, at least one juror would have answered the mitigation issue differently and voted to spare Applicant's life. Consequently, we sustain Applicant's third claim.

## VI.     Applicant's Other Allegations

We have reviewed the record regarding Applicant's remaining allegations.[16] In his first, eighth, eleventh, thirteenth, sixteenth, seventeenth, eighteenth, nineteenth, twenty-fourth, twenty-fifth, and twenty-seventh allegations, Applicant alleges that his trial counsel were constitutionally ineffective by failing to:

- formulate a cohesive defensive theory;

- object to the application paragraphs in the jury charge;

- ask certain questions of venire members about whether they could consider a life sentence and/or give meaningful consideration to mitigation evidence;

---

[16]Applicant initially raised a total of twenty-eight claims. However, at the evidentiary hearing, habeas counsel announced that Applicant was abandoning claims two, nine, twenty, and twenty-one. By letter to the trial court dated October 1, 2014, habeas counsel reiterated the intent to withdraw those four claims and also stated that Applicant was withdrawing his tenth, twelfth, and fourteenth claims for relief.

- investigate and present evidence disputing a witness's assertions about Applicant's oral statements;

- challenge the admissibility of "false and prejudicial junk science" gang expert testimony;

- preserve a defense of prior jeopardy regarding Count Two or assert that the death penalty may not be imposed under the Eighth and Fourteenth Amendments; and

- preserve alleged constitutional errors in the punishment jury charge.

In considering ineffective-assistance-of-counsel claims, we employ a strong presumption that counsel's conduct fell within the wide range of reasonable assistance and that the challenged conduct could be considered sound trial strategy. *Ex parte Chandler*, 182 S.W.3d 350, 354 (Tex. Crim. App. 2005). With regard to the specific ineffective-assistance claims here, we conclude that Applicant has not satisfied *Strickland*'s requirements. *See Strickland*, 466 U.S. at 687–88. Further, we rejected Applicant's twenty-fourth allegation on direct appeal. *Garza*, AP-75,217, 2008 WL 1914673, at *9; *see also Ex parte Hood*, 304 S.W.3d 397, 402 n.21 (Tex. Crim. App. 2010) ("[T]his Court does not re-review claims in a habeas corpus application that have already been raised and rejected on direct appeal.").

In Applicant's fourth, fifth, and sixth claims, he argues that his conviction must be set aside due to jurors not understanding the applicable law and a hostile atmosphere due to jurors' fears of gang members. He further argues that the jurors improperly began deliberations prematurely (until the judge instructed them on the fourth day of trial to

refrain from deliberating). Applicant presents statements from four jurors to support his allegations. He contends that the misconduct deprived him of his constitutional rights to due process and a fair trial. However, Texas Rule of Evidence 606(b) prohibits this Court from considering the type of juror statements presented by Applicant. *See Colyer v. State*, 428 S.W.3d 117, 125 (Tex. Crim. App. 2014) ("[A] Rule 606(b) inquiry is limited to that which occurs both outside of the jury room and outside of the jurors' personal knowledge and experience."); *see also Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985) ("In a postconviction collateral attack, the burden is on the applicant to allege and prove facts which, if true, entitle him to relief.").

In his seventh allegation, Applicant contends that language used in the jury charge's second-count application paragraph denied him the presumption of innocence. In his twenty-second allegation, Applicant argues that the death penalty may not be imposed because "prior jeopardy bars the Count Two capital murder conviction and death sentence." In his twenty-third allegation, Applicant asserts that the life sentence "imposed on the same facts" for Count One precludes the "arbitrary and capricious infliction of death" for Count Two. Applicant raised substantively similar claims of error on direct appeal. *See Garza*, 2008 WL 1914673, at *3–4. This Court sustained one of Applicant's double-jeopardy arguments on direct appeal (retaining his capital murder conviction under Count Two because it was the "most serious" offense). *Id*. Therefore, Applicant's

seventh, twenty-second, and twenty-third claims are procedurally barred. *See Hood*, 304 S.W.3d at 402 n.21.

In his fifteenth allegation, Applicant maintains that the trial court's admission of his oral custodial statements deprived him of a fair trial because facts contained in those statements were already known to authorities. *See* TEX. CODE CRIM PROC. art. 38.22 § 3(c). He argues that the alleged "violation of the Texas exclusionary rule denied [him] the protections of the Due Process Clauses of the 5th and 14th Amendments . . . and the heightened reliability requirement of the Cruel and Unusual Punishment Clause of the Eight Amendment." Applicant presents extra-record facts, including the 2007 statement of a co-defendant, to support this claim. Traditionally, habeas corpus is available only to review jurisdictional defects and denials of constitutional or fundamental rights; violations of procedural statutes may not be raised for the first time on post-conviction habeas review. *See Ex parte Banks*, 769 S.W.2d 539, 540–41 (Tex. Crim. App. 1989); *see also Bagheri v. State*, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003) (internal citation omitted) ("Erroneous evidentiary rulings rarely rise to the level of denying [] fundamental constitutional rights[.]"); *Woods v. State*, 152 S.W.3d 105, 118 (Tex. Crim. App. 2004) (holding that admitting a statement in violation of Article 38.22 of the Texas Code of Criminal Procedure was "non-constitutional error").

In Applicant's twenty-sixth allegation, he argues that the trial court gave the sentencing jury a punishment charge that denied him a fair trial on future dangerousness,

interfered with the jury's full consideration of mitigating circumstances, and did not comply with *Enmund v. Florida*, 458 U.S. 782, 783 (1982). The majority of these constitutional claims are procedurally barred because we rejected them on direct appeal. *See Garza*, AP-75,217, slip op. at 18–24; *see also Hood*, 304 S.W.3d at 402 n.21. To the extent that Applicant raises arguments that he did not bring forth on direct appeal, we find that they are procedurally barred because he should have raised them on direct appeal. *See Ex parte Nelson*, 137 S.W.3d 666, 667 (Tex. Crim. App. 2004) (quoting *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996)) ("It is well-settled 'that the writ of habeas corpus should not be used to litigate matters which should have been raised on direct appeal.'") (internal citations omitted).

In Applicant's twenty-eighth allegation, he argues that he is "actually innocent of [the] death penalty" because the jury's "prediction that he will be a continuing threat to society has been undermined by [Applicant's] good conduct time from the time of his arrest to the present time." Applicant contends that Texas's statutory system is constitutionally infirm and, to avoid arbitrariness and capriciousness, certain additional elements must be incorporated into the future-dangerousness inquiry. He contends that these should include elements such as requiring a "serious lasting threat of death or serious bodily injury" that exposes society to an "unmanageable risk." He avers that "the Texas system is constitutionally flawed because it does not explicitly permit what he seeks here: a post-conviction review of his post-conviction conduct in prison to test the

prediction made by the jury." Applicant has not provided legal authority that supports this challenge to the Texas statutory scheme or his demand for an evidentiary hearing. *See Maldonado*, 688 S.W.2d at 116.

This Court has reviewed Applicant's allegations and denies relief on those allegations based upon our own review of the record.

## VII. Conclusion

Because we conclude that Applicant is entitled to a new punishment trial based on ineffective assistance of counsel, we remand this cause to the trial court to conduct a new punishment trial.

Delivered: April 14, 2021

Publish